UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
NEW YORK PACKAGING II LLC d/b/a REDIBAG
USA,

                                        Plaintiff,

                -against-

MUSTANG MARKETING GROUP LLC and
JOHN MAIERHOFFER,

                                        Defendants.
-----------------------------------------------------------------X

For Online Publication Only

**ORDER**
21-cv-01629 (JMA) (ARL)

FILED
CLERK

2:51 pm, Mar 01, 2022

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**AZRACK, United States District Judge:**

Before the Court is a motion by Plaintiff New York Packaging II LLC d/b/a RediBag USA ("Plaintiff" or "RediBag") for a preliminary injunction against Defendants Mustang Marketing Group LLC and John Maierhoffer (together, "Defendants" or "Maierhoffer").  ("Pl's Mem.," ECF No. 18.)  RediBag requests that the Court enter an order enjoining Maierhoffer from violating a non-compete agreement and from using RediBag's pricing, sales, or technical product information which it alleges are trade secrets.  In response, Defendants filed a motion to dismiss for failure to state a claim and improper venue ("Defs.' Mot. to Dismiss," ECF Nos. 16,17), and memorandum of law opposing Plaintiff's motion for a preliminary injunction.  ("Def.'s Opp'n", ECF No. 18-4.) This Order resolves those motions.

For the reasons set forth below, the Court denies Plaintiff's motion for a preliminary injunction and denies Defendants' motion to dismiss.

## I.  BACKGROUND

RediBag is a Nassau County-based supplier that sells paper and plastic bags, among other items, to grocery stores, restaurants, delis, and dry cleaners.  (Declaration of J. Rabiea in Support of Plaintiff's Motion for Preliminary Injunction ("Rabiea Decl.") ¶¶ 2-3, ECF No. 18-2.)

Maierhoffer owns and operates an independent Florida-based business, Mustang Marketing Group LLC, that brokers the sales of such products on behalf of suppliers like RediBag. (Rabiea Decl. ¶ 3; see also Declaration of John Maierhoffer, ("Maierhoffer Decl.") ¶¶ 2-5, ECF No. 18-5.)

RediBag and Maierhoffer have conducted business since 2008. (Rabiea Decl. ¶ 4.) From 2008 until February 2016, Maierhoffer worked as an independent sales broker and received a percentage commission for the sale of RediBag products. (Rabiea Decl. ¶ 6.) During this time period, Maierhoffer did not have an exclusive relationship with RediBag. (Maierhoffer Decl. ¶ 25.)

In or around February 2016, Maierhoffer took on management and training responsibilities at RediBag, began receiving a monthly salary instead of a commission, and received business cards identifying him as RediBag's sales manager. (Rabiea Decl. ¶ 6; Maierhoffer Decl. ¶¶ 26-28.) In August 2016, Maierhoffer's role at RediBag transitioned from an outside broker to an inside sales manager. (Maierhoffer Decl. ¶ 26.) In this role, Maierhoffer assisted in hiring and training RediBag's sales team. (Maierhoffer Decl. ¶ 29.) As part of the role, RediBag helped subsidize Maierhoffer's health benefits. (Maierhoffer Decl. ¶ 26.)

Thereafter, in August 2016, the parties executed  a "Non-Compete and Non-Solicitation Agreement" (the "August 2016 Agreement" or "Agreement"). (Rabiea Decl. ¶ 10.) The August 2016 Agreement imposed certain limitations on Maierhoffer's right to solicit certain sales to RediBag customers, both during and after his relationship with the company. (Rabiea Decl. ¶ 12.) The Agreement states, in relevant part:

> In consideration of the independent contractor opportunity provided by New York Packaging II, LLC, You, intending to be legally bound, agree to the following:
>
> 1. **Term of Agreement.** This Agreement is effective on the Effective Date, and shall remain in effect throughout the term of your relationship with the Company as an independent contractor and for a period of two years thereafter.

2

****

3. **Covenant Not to Compete.** You agree that at no time during the term of your relationship with the Company as an independent contractor will you engage in any business activity which is directly competitive with the Company nor work for any company which directly competes with the Company. The only exceptions shall be with the companies for which You currently represent. You are permitted to market products that are not directly competitive with Company products on behalf of Barnes Paper, Omega, IBSffrinity Plastics, Pakpro and Advance Polybag lnc.

4. **Non-solicitation.** During the term of your relationship with the Company as an independent contractor, and for a period of two (2) years immediately thereafter, You agree not to solicit any employee or independent contractor of the Company on behalf of any other business enterprise, nor shall you induce any employee or independent contractor associated with the Company to terminate or breach an employment, contractual or other relationship with the Company.

5. **Soliciting Customers after Termination of Agreement.**

****

B. If You voluntarily terminate your relationship with the Company as an independent contractor: for a period of two (2) years following the termination of your relationship with the Company as an independent contractor, You shall not, directly or indirectly, disclose to any person, firm or corporation the names or addresses of any of the customers or clients of the Company or any other information pertaining to them. Neither shall you call on, solicit, take away, or attempt to call on, solicit, or take away any customer of the Company on whom You have called or with whom You became acquainted during the term of your relationship with the Company as an independent contractor, as the direct or indirect result of your relationship with the Company. There shall be one exception. You may continue to solicit Company customers with whom you personally have called on within the last twelve ( 12) months prior to termination, but only to sell product lines that are not competitive with the Company's existing business.

****

6. **Injunctive Relief.** You hereby acknowledge (1) that the Company will suffer irreparable harm if You breach your obligations under this Agreement; and (2) that monetary damages will be inadequate to compensate the Company for such a breach. Therefore, if You breach any of such provisions, then the Company shall be entitled to injunctive relief, in addition to any other remedies at law or equity, to enforce such provisions.

\*\*\*\*

**8. Modifications.**  This Agreement may be modified only be a writing executed by both you and the company.

(August 2016 Agreement).

On February 8, 2019, Maierhoffer resigned, in writing, from RediBag, but informed RediBag that he would "be happy to continue representing [RediBag] as an 'independent broker.'" (Maierhoffer Decl., Ex. C.)  That same day, RediBag sent Maierhoffer a letter accepting his resignation and indicated that the non-compete provisions of the August 2016 Agreement would apply to Maierhoffer "[f]or the two-year period following [his] voluntary termination."  (Rabiea Decl., Ex. D.)  Maierhoffer subsequently acted as an independent broker for a few RediBag transactions in 2019 and 2020.  (Rabiea Decl., Ex. D.)

In 2020 and 2021, the parties had a variety of disputes related to the payment of commissions to Maierhoffer.  (Rabiea Decl. ¶ 18.) On March 2, 2021, Mustang terminated its broker relationship with RediBag.  (Rabiea Decl. ¶ 21.)  Maierhoffer then commenced a state action in Florida against RediBag alleging unpaid commissions.  (Rabiea Decl. ¶ 22.)

On March 26, 2021, RediBag commenced this instant action against Maierhoffer alleging both federal and state claims, including breach of contract and misappropriation of trade secrets, under both state and federal law, for which RediBag seeks injunctive relief.  On May 19, 2021, pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(3), and 12(b)(6), Maierhoffer moved to dismiss the Complaint for failure to state a claim and, in the alternative, for improper venue.

## II.  DISCUSSION

### A.    Venue

The Court first turns to Maierhoffer's motion to dismiss for improper venue then his motion to dismiss for failure to state a claim.  One Techs., LLC v. Amazon.com, Inc., 860 F. App'x 785, 788 (2d Cir. 2021)(citing Arrowsmith v. United Press Int'l, 320 F.2d 219, 221 (2d Cir. 1963) in holding that a motion to dismiss for improper venue must be considered before a motion to dismiss for failure to state a claim.)

### 1.    Venue under 28 U.S.C. § 1391(b)

28 U.S.C. § 1391(b), provides that "[a] civil action may be brought in (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action."  28 U.S.C. § 1391(b).

Venue is appropriate in any judicial district in which a substantial part of the underlying events took place and may be appropriate in multiple districts.  Bates v. C & S Adjusters, Inc., 980 F.2d 865, 867 (2d Cir. 1992).  If the subject of the action is property, venue is also appropriate in a district in which a substantial part of the property is situated.  28 U.S.C. § 1391(b)(2).  When venue is proper in more than one district, the plaintiff has no obligation to determine the "best venue," Bates, 980 F.2d at 867, nor to file in the most convenient forum, Sussman v. Bank of Israel, 56 F.3d 450, 457 (2d Cir.1995) (quotations omitted).  Importantly, the civil venue statute permits venue in multiple judicial districts as long as "a substantial part" of the underlying events

took place in those districts.  See Gulf Ins. Co. v. Glasbrenner, 417 F.3d 353 (2d Cir. 2005)("[T]he civil venue statute permits venue in multiple judicial districts as long as a substantial part of the underlying events took place in those districts")(internal quotations omitted).

On a motion to dismiss a complaint under Rule 12(b)(3) for improper venue, "the plaintiff bears the burden of establishing that venue is proper." French Transit v. Modern Coupon Sys., 858 F. Supp. 22, 25 (S.D.N.Y. 1994).  While the plaintiff bears the burden of establishing that venue is proper, "[i]f the court chooses to rely on pleadings and affidavits, the plaintiff need only make a prima facie showing of [venue]." Id. (quoting CutCo Indus. v. Naughton, 806 F.2d 361, 364-65 (2d Cir. 1986)).  In determining whether venue is proper, the court "must view all facts in the light most favorable to the plaintiff." Cold Spring Harbor Lab., 762 F. Supp. 2d 543, 551 (E.D.N.Y. 2011) (citing Phillips v. Audio Active Ltd., 494 F.3d 378, 384 (2d Cir. 2007)).  Accordingly, the "court must accept the facts alleged in the complaint and construe all reasonable inferences in the plaintiff's favor." Id. (quoting Matera v. Native Eyewear, Inc., 355 F.Supp.2d 680, 681 (E.D.N.Y. 2005)).

## 2.     Venue is Proper in the Eastern District of New York

Maierhoffer argues that the Eastern District of New York is an improper venue, because he and Mustang are residents of Florida and RediBag has not alleged that any significant events occurred in this District.  (Defs.' Mot. to Dismiss at 9.) In response to Maierhoffer, RediBag argues, among other things, that "substantial events" such as the development of its trade secrets and access to its trade secrets occurred from this District, an allegation uncontradicted by Maierhoffer.  ("Pl's Opp'n" at 15-16, ECF 18-6; see generally Defs.' Mot. to Dismiss.)

This is a straightforward matter.  Plaintiff's argument that its trade secrets were developed and accessed from this District, alone, is sufficient for venue.  Specifically, "[a]cquiring trade

6

secrets by accessing a server in New York can be a significant event for venue purposes." irth Sols., LLC v. Apex Data Sols. & Servs., LLC, No. 18-CV-6884, 2019 WL 283831, at *4 (W.D.N.Y. Jan. 22, 2019) (finding venue proper based on the location of plaintiff's server from where defendant's alleged misappropriation of trade secrets occurred); see id  ("Argent Funds Grp., LLC v. Schutt, 05-CV-01456, 2006 WL 2349464, at *2 (D. Conn. June 27, 2006) (finding venue proper where substantial events material to a misappropriation claim occurred in Connecticut when non-Connecticut defendant allegedly accessed a Connecticut server to steal confidential information").

Maierhoffer's remaining arguments are unpersuasive.  In this Circuit, venue may be proper in multiple judicial districts as long as a substantial part of the underlying events took place in those districts.  See Gulf Ins. Co. v. Glasbrenner, 417 F.3d 353 (2d Cir. 2005).  RediBag has pled facts sufficient to demonstrate that venue is proper in this district.  Accordingly, Defendant's motion to dismiss for improper venue is denied.

**B.** **Motion to Dismiss**

    **1.** **Standard of Review**

Next, the Court considers Maierhoffer's motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6).  In deciding such a motion, a court should "draw all reasonable inferences in Plaintiff['s] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." Faber v. Metro.  Life Ins. Co., 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted).

The plausibility standard is guided by two principles.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007) ); accord Harris v. Mills, 572 F.3d 66, 71–72 (2d Cir. 2009).  "First, the principle that a court must accept all allegations as true is

inapplicable to legal conclusions."  Gen. Sec., Inc. v. Com. Fire & Sec., Inc., 17-CV-1194, 2018 WL 3118274, at *3 (E.D.N.Y. June 25, 2018)(quoting Iqbal, 556 U.S. at 678).  "Second, only complaints that state a plausible claim for relief can survive a motion to dismiss." Id (citing Iqbal, 556 U.S. at 679.) Generally, a district court must confine its consideration "to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." (citing Leonard F. v. Israel Disc. Bank of New York, 199 F.3d 99, 107 (2d Cir. 1999)).  Here, the Court finds the Complaint sufficiently pleads the trade secrets at issue and that Defendants have misappropriated them.

## 2.   **Misappropriation of Trade Secrets**

RediBag brings a claim for misappropriation of its trade secrets under the Defend Trade Secrets Act ("DTSA").  In order to assert a claim of misappropriation of trade secrets under DTSA, RediBag must show that it is (1) "[a]n owner of a trade secret;" (2) the trade secret was "misappropriated;" and (3) "the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).[1]

Courts weigh six (6) factors in determining whether the information at issue constitutes a trade secret: (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.  24 Seven, LLC v. Martinez, No. 19-CV-7320, 2021 WL 276654, at *5 (S.D.N.Y. Jan. 26, 2021) (internal citations omitted).

---

[1] To the extent RediBag brings its misappropriation of trade secrets claim under state law, Plaintiff acknowledges that the analysis and result is the same.  (Pl's Mem. at 15)

Generally, information that is readily ascertainable through public sources cannot be a trade secret, nor can even a former employee's recollection of its former employer's business operations be a trade secret.  See, e.g., Liberty Power Corp., LLC v. Katz, No. 10-CV-1938, 2011 WL 256216, at *2 (E.D.N.Y. Jan. 26, 2011);  24 Seven, 2021 WL 276654, at *9.

The Complaint sufficiently identifies the trade secrets at issue.  RediBag specifies compilations of confidential pricing, sales, and product information as its trade secrets.  (Compl. at ¶¶ 44-50, 105-106.) Contrary to Maierhoffer's assertion, at this stage, this is sufficient."[T]here is no heightened pleading requirement on actions brought under the DTSA." Gen. Sec., Inc., at *4 (citing Telsa Wall Sys. v. Related Companies, L.P., 2017 WL 6507110, at *10 (S.D.N.Y. Dec. 15, 2017)).  Further, "trade secrets need not be disclosed in detail" to allege misappropriation.  Tesla Wall Sys., LLC v. Related Companies, L.P., 2017 WL 6507110, at *10 (S.D.N.Y. Dec. 18, 2017) (denying motion to dismiss a DTSA claim and finding the general categories plead "technical data, internal pricing information, work product, research, […]" were sufficiently specific.)

The Complaint facially pleads that Plaintiffs took reasonable steps to protect the trade secrets.  RediBag restricted access to its alleged trade secrets to personnel on a need-to-know basis and required employees and independent contractors to sign confidential agreements and other contracts.  (Compl. at ¶¶ 48-49, 102.)  Medidata Sols., Inc., v. Veeva Sys. Inc., 17-CIV-589, 2018 WL 6173349, at *3 (S.D.N.Y. Nov. 26, 2018) (holding that "security measures" such as "nondisclosure agreements" and "restricted access … by using passwords" are "sufficient" as reasonable steps.)

The Complaint also plausibly alleges that RediBag's pricing, sales, and product information have independent economic value, by being kept confidential, and that RediBag has expended a great amount of resources to develop and keep them secret.  (Compl. at ¶¶ 104, 116-

9

117.) As to the claim of misappropriation, the Complaint alleges that Maierhoffer misappropriated its trade secret through of a breach of an agreement or duty.  (Compl. at ¶¶ 109.)  See Medidata Sols., Inc., * 4 ("improper means" under DTSA includes contractual agreements not to disclose or disseminate information.")

Taken together, these allegations plausibly raise an inference that Maierhoffer misappropriated RediBag's trade secrets.  To the extent, Maierhoffer disputes "the secrecy of [the] information," this is "generally a question of fact [that] not to be resolved at the pleadings stage." Gen. Sec., Inc., at *5 (E.D.N.Y. June 25, 2018).  Defendants' motion to dismiss is therefore denied.

## C.     Preliminary Injunction

### 1.     Legal Standard

RediBag seeks a preliminary injunction for its DTSA claim.  In great contrast to the more lenient plausibility standard a motion to dismiss is reviewed under, "[a] preliminary injunction is an "extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  Sussman v. Crawford, 488 F.3d 136, 139 (2d Cir. 2007) (citing Mazurek v. Armstrong, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997)).

To successfully seek a preliminary injunction, a moving party must show four elements: (1) likelihood of success on the merits; (2) likelihood that the moving party will suffer irreparable harm if a preliminary injunction is not granted; (3) that the balance of hardships tips in the moving party's favor; and (4) that the public interest is not disserved by relief.  Salinger v. Colting, 607 F.3d 68, 79–80 (2d Cir. 2010).  "In performing this analysis courts must be mindful that "[a] preliminary injunction is an extraordinary remedy never awarded as of right."  Liberty Power Corp., LLC v. Katz, No. 10-CV-1938, 2011 WL 256216, at *2 (E.D.N.Y. Jan. 26, 2011) (finding plaintiff did not show irreparable harm and thus, was not entitled to a preliminary injunction).

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 118 (2d Cir. 2009)(citing Rodriguez ex rel. Rodriguez v. DeBuono, 175 F.3d 227, 234 (2d Cir.1998)). Irreparable harm is the "sine qua non for preliminary injunctive relief." USA Recycling, Inc. v. Town of Babylon, 66 F.3d 1272, 1295 (2d Cir.1995); see also JBR, Inc. v. Keurig Green Mountain, Inc., 618 F. App'x 31, 33 (2d Cir. 2015) (summary order) (same).  Accordingly, "[i]f a party fails to show irreparable harm, a court need not even address the remaining elements of the preliminary injunction standard." Intertek Testing Servs., N.A., Inc. v. Pennisi, No. 19-CV-7103, 2020 WL 1129773 (E.D.N.Y. Mar. 9, 2020).

To satisfy the irreparable harm requirement, RediBag must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm.  Faiveley, 559 F.3d 110, 118 (2d Cir. 2009) (quoting Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007) (internal citations and quotation marks omitted).

RediBag puts forth two arguments in support of its claim that, absent a preliminary injunction, it will likely suffer irreparable harm.  Namely, RediBag argues that (1) Maierhoffer has taken and misappropriated its trade secrets, and (2) Maierhoffer has sold competitive products to RediBag's customers in breach of the non-compete provision contained in the August 2016 Agreement.  RediBag's arguments are addressed below in turn.  On both points, RediBag fails to bear its burden.

### 2.    Misappropriation of Trade Secrets

"A plaintiff is not entitled to preliminary relief prohibiting the misappropriation of trade secrets unless it demonstrates that a defendant likely misappropriated a trade secret." Liberty

11

Power Corp., LLC v. Katz, No. 10-CV-1938, 2011 WL 256216, at *2 (E.D.N.Y. Jan. 26, 2011)

See, also, 24 Seven, 2021 WL 276654, at *12 (denying injunctive relief where plaintiff did not

show the information allegedly taken was as a trade secret).

As explained below, RediBag has not established that it is likely to prevail on its argument

that the information allegedly misappropriated by Maierhoffer were, in fact, trade secrets.

On the fuller record, Plaintiff's proof about its alleged confidential information and trade

secrets is conclusory and lacking in particulars.  Plaintiff relies on a declaration from RediBag's

President, Jeffrey Rabiea, which states:

> In his role as RediBag's broker, Maierhoffer had access to highly confidential
> pricing, sales, and technical product information. To sell products, he had to learn
> what products RediBag sells to particular customers around the country and the
> prices at which RediBag is willing to sell. A distributor's pricing, sales, and
> technical product information takes substantial time and resources to compile, is
> extremely valuable, and is widely understood in the industry to be highly
> confidential. Such information is also highly valuable to a distributor's competitors,
> who can use it to compete unfairly by slightly undercutting the distributor's
> prices—which is precisely what happened to RediBag. RediBag takes reasonable
> steps to keep its information confidential, including restricting access to
> information using technical measures, and requiring employees and independent
> contractors to sign non-compete agreements and other contracts.

(Rabiea Decl. ¶ 9.)  Rabiea never provides any details about what constitutes the "technical product

information."  Similarly, other than referencing information about the specific "products RediBag

sells to particular customers," Rabiea does not identify what constitutes the allegedly confidential

"sales" information.

In contrast to Plaintiff's meager and conclusory proof, the declaration submitted by

Maierhoffer provides important details regarding the information that Plaintiff alleges constitute

trade secrets.

Maierhoffer explains that half of his sales are run though a bidding process where the "the

client invites several suppliers (and their representatives) to submit bids" and

"[t]he bids are made public to all parties." (Maierhoffer Decl. ¶ 6.)  Plaintiff did not submit any evidence with its reply papers and does not offer any proof to refute this specific and persuasive evidence from Maierhoffer.  For any customers who utilized this public bidding process, pricing information is clearly not confidential and is available to competitors.  Relatedly, this public bidding process suggests that other information in the bids, beyond mere price, is also publicly disclosed.  Furthermore, the ubiquity of this public bidding process and the amount of RediBag information that is available to competitors through this process also undercuts any claim that pricing and other information for customers that do not use a public bidding process rises to the level of trade secret.

Maierhoffer also explains that "[p]ricing information is available through numerous sources" because "[b]uyers share pricing with their third-party distributors and wholesalers" and "[b]uyers also share pricing with potential suppliers to achieve maximum value in quality and service." (Maierhoffer Decl. ¶ 12.)  Again, RediBag does not offer any contrary evidence and relies on Rabiea's conclusory statement that "[a] distributor's pricing, sales, and technical product information [are] widely understood in the industry to be highly confidential."  Maierhoffer's declaration is more persuasive than the conclusory proof offered by Plaintiff.  It is not surprising that buyers would be willing to share the current prices they are paying in an attempt to obtain a better deal on their next contract or order from a different supplier.

Finally, Maierhoffer's uncontradicted affidavit explains that, with only one exception, "he introduced RediBag to every client at issue in this case." (Maierhoffer Decl. ¶ 23.)  Notably, RediBag does not assert that the identity of its customers constitutes a trade secret.

On the record before the Court, RediBag has not demonstrated that that it is likely to succeed in establishing that its "pricing, sales, and product information" constitute trade secrets thereby meriting injunctive relief.

As an initial matter, Plaintiff's evidence about its alleged trade secrets is simply too conclusory and lacking in particulars to establish that the information at issue rises to the level of a trade secret. RediBag has failed to establish, on the fuller record, how the broad and general categories of information at issue rise to the level of trade secrets. See Sussman v. Crawford, 488 F.3d 136, 139 (2d Cir. 2007) ("A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.") (emphasis added). A plaintiff pleading a DTSA claim cannot "get away" with "nebulous descriptions at the highest level of generality." TRB Acquisitions LLC v. Yedid, No. 20-CV-0552, 2021 WL 293122, at *2 (S.D.N.Y. Jan. 28, 2021) (finding "product categories and markets, including which types of consumers to target, which retail and other channels to enter and at which price points" as 'too general' to be trade secrets").

Based on the entire record before the Court, without more, RediBag is simply unlikely to establish the information at issue, including RediBag's pricing information, constitutes trade secrets. "Pricing information may constitute a trade secret under certain circumstances." 24 Seven, 2021 WL 276654, at *8 (citing In re Dana Corp., 574 F.3d 129, 152 (2d Cir. 2009)); see also Juniper Ent., Inc. v. Calderhead, No. CV072413, 2007 WL 9723385, at *23 (E.D.N.Y. Aug. 17, 2007). However, "'this is generally where a company uses some type of proprietary formula that gives it a unique advantage, such as a complex pricing or trading algorithm in a financial business.'" 24 Seven, 2021 WL 276654, at *8 (quoting Free Country Ltd v. Drennen, 235 F. Supp. 3d 559, 566–67 (S.D.N.Y. 2016). RediBag's conclusory proof about its compilation of "pricing"

14

and "sales" information" do not tie to an "algorithm," "analytic model," or propriety pricing approach.  Zabit v. Brandometry, LLC, No. 20-CV-555, 2021 WL 1987007 (S.D.N.Y. May 18, 2021) (citing Elsevier Inc., 2018 WL 557906, at *5-6.)  Moreover, even assuming arguendo that RediBag's pricing information could still potentially qualify for trade secret protection, the totality of the circumstances here indicate RediBag's pricing information is not a trade secret.

RediBag has not established that it is likely to succeed on its trade secrets claims about its pricing, sales, and product information fail because this information is already available to its competitors.  The most important consideration in determining whether information is a trade secret is whether the information was secret."  Zabit, 2021 WL 1987007, at 422.  "Matters of . . . general knowledge in an industry cannot be appropriated by one as [a] secret." Ramirez v. Temin & Co., Inc., No. 20 CIV. 6258, 2020 WL 6781222, at *4 (S.D.N.Y. Nov. 18, 2020)

Not only is RediBag's proof about its alleged trade secrets conclusory, but Maierhoffer has submitted persuasive and uncontradicted evidence that includes specifics about the industry, including the important fact that sales are often conducted through a public bidding process. Through, both, that public bidding process and the voluntary disclosures of customers themselves, competitors already have access to much of the information that RediBag claims constitutes trade secrets, which would defeat RediBag's claim.  See 24 Seven, 2021 WL 276654, at *8 (finding that the plaintiff failed to establish that pricing information was a trade secret where the plaintiff did not "raise any facts that contradict Defendants' description that prices could be obtained by contacting companies and requesting this information"); Silipos, Inc. v. Bickel, No. 06-CV-02205, 2006 WL 2265055, at *4 (S.D.N.Y. Aug. 8, 2006) ("Silipos' discount prices are not trade secrets because they are well known, as customers in this narrow industry liberally 'talk about discounts of the different manufacturers with which they work' in order to negotiate the lowest prices.'").

15

Furthermore, not only is a substantial amount of information about RediBag's pricing and sales already available and accessible, but, to the extent RediBag is suggesting that it has a confidential pricing structure, RediBag's "publicly-available prices" discussed above would also "signal to competitors some information about the underlying mechanics of the seller's pricing structure." Drennen, 235 F. Supp. 3d at 567.

Plaintiff's evidence about confidential "technical information" is also conclusory and is clearly insufficient to establish that this unspecified information constitutes a trade secret.   The Court takes judicial notice that RediBag readily offers certain technical information about its products on the internet.  Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio, 364 F. Supp. 3d 253, 262 (S.D.N.Y.), aff'd, 788 F. App'x 85 (2d Cir. 2019)(citing Fed. R. Evid. 201(c) and denying preliminary injunction, in part, based on information that the court sua sponte could accurately and readily determined from an internet search.); see, also, Brainwave Sci., Inc. v. Arshee, Inc., No. 21-CV-4402, 2021 WL 6211630, at *3 (E.D.N.Y. Dec. 14, 2021) ("When supposedly secret information is publicly procurable, without some type of reservation of rights, it cannot be proprietary.")

Finally, RediBag's proof about "the extent of measures [it has taken] to guard the secrecy of the information" is also lacking.  While RediBag relies on its confidentiality agreement with Maierhoffer, that agreement cannot save its trade secret claim.  See Zabit, 2021 WL 1987007, at 422 (expressing skepticism that a confidentiality agreement alone can suggest the existence of trade secret.)  Here, eight years passed before RediBag required Maierhoffer to sign an agreement with confidentiality provisions.  Notably, this only occurred in August 2016—approximately six months after Maierhoffer started his management role at RediBag—which undercuts RediBag's claims that it closely protects the alleged trade secrets,  The actual confidentiality provisions of the

Agreement are also notable.  The Agreement simply provides that, for two years after the termination of Plaintiff's relationship, Plaintiff shall not "directly or indirectly, disclose to any person, firm or corporation the names or addresses of any of the customers or clients of the Company or any other information pertaining to them."  The Agreement says nothing about "technical information."

RediBag's other proof about the "the extent of measures [it has taken] to guard the secrecy of the information" is also lacking.  Other than Maierhoffer's agreement, the entirety of the RediBag's proof on this point consists of one sentence in Rabiea's declaration, which states: "RediBag takes reasonable steps to keep its information confidential, including restricting access to information using technical measures, and requiring employees and independent contractors to sign non-compete agreements and other contracts."  (Rabiea Decl. ¶ 9.)  This declaration provides no details about these "technical measures" or about any of the unspecified agreements that RediBag requires its independent contracts, including its "brokers" to sign.  Notably, Rabiea's declaration admits that RediBag works with "independent brokers to assist in product sales." (Rabiea Decl. ¶ 3.)  While RediBag apparently also works with other independent brokers besides Maierhoffer, the record contains no copies of any agreements between RediBag and these other independent brokers.  Furthermore, whatever agreements RediBag had with Maierhoffer and other brokers cannot overcome the persuasive evidence in Maierhoffer's declaration that the customer information at issue is not a trade secret because it is disclosed through the public bidding process and by the customers themselves.

RediBag has simply failed to establish that it is likely to succeed on its trade secrets claim.

**3.** **Breach of Covenant**

RediBag's argument that the Court should grant a preliminary injunction based on its breach of covenant claim also fails.  RediBag has not established irreparable harm.  Nor has RediBag shown that it is likely to succeed on the merits of its claim.

**a. Irreparable Harm**

It is "very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come." Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 69-70 (2d Cir.1999).  As such, an "employer may suffer irreparable harm when a former employee violates a non-compete clause and thereby causes the former employer to lose client relationships and customer good will that the employer had built up over years." Int'l Creative Mgmt., Inc. v. Abate, No. 07 CIV. 1979, 2007 WL 950092, at *3 (S.D.N.Y. Mar. 28, 2007) (finding no irreparable harm despite contractual provision acknowledging "great and irreparable injury and damage" in the event of a breach)

RediBag accuses Maierhoffer of breaching the August 2016 Agreement, in part, because "one of [RediBag's] competitors" made sales of competitive products to one of its customers." (Pl.'s Mem. at 7.)  RediBag argues that Maierhoffer's "explicit[] acknowledge[ment]" in the agreement that RediBag would suffer irreparable harm, alone, "is enough to show irreparable harm." (Pl.'s Mem. at 19-20.)  Defendants argue that RediBag cannot establish irreparable harm, because the non-compete is unenforceable.  (Def.'s Opp'n at 14.)

RediBag has failed to make a showing of irreparable harm, because its principal argument is that irreparable harm must be assumed based on an alleged breach of the non-compete.  Courts have soundly rejected this argument.  See, e.g., Singas Famous Pizza Brands Corp. v. New York Adver. LLC, No. 10-CV-8976, 2011 WL 497978, at *6 (S.D.N.Y. Feb. 10, 2011), aff'd, 468 F,

App'x (2d Cir. 2012) ("this Court has rejected the proposition that irreparable harm must inevitably be assumed in breach of covenant cases") (internal citations omitted); Baker's Aid, Div. of M. Raubvogel Co. v. Hussmann Foodservice Co., 830 F.2d 13, 16 (2d Cir. 1987) ("We also agree with the district court that the contractual language declaring money damages inadequate in the event of a breach does not control the question whether preliminary injunctive relief is appropriate."); see also Intertek Testing Servs., N.A., Inc. v. Pennisi, 19-CV-7103, 2020 WL 1129773 (E.D.N.Y. Mar. 9, 2020) ("in determining whether the plaintiff demonstrated irreparable harm, the court must not adopt a categorical or general rule or presume that the plaintiff will suffer irreparable harm […])(internal citations omitted).

RediBag has not sufficiently demonstrated any actual or imminent loss of client relationships and customer good will. It points to no specific long-term or recurring client relationships that are threatened or offered evidence of goodwill that will be lost. Int'l Creative Mgmt., 2007 WL 950092, at *3 (finding no irreparable harm where plaintiff did not provide evidence of "goodwill it ha[d] built up with individual clients over the course of several representations."). Further, Maierhoffer's declaration indicates that some of the alleged sales activity was one-off activity. For example, Maierhoffer no longer markets or sells hand sanitizer products. (Maierhoffer Decl. ¶ 23.) see, also, Elpac, Ltd. v. Keenpac North America, Ltd., 186 A.D.2d 893, 895 (N.Y. App. Div. 1992) ("[W]e are not persuaded on this record that the European-style shopping bag market is such that the individual defendants' wrongful diversion of one order would give defendants an unfair competitive edge in connection with subsequent orders from the same customer."); Liberty Power Corp., LLC v. Katz, No. 10-CV-938, 2011 WL 256216, at *7 (E.D.N.Y. Jan. 26, 2011) (finding that harm was not irreparable where plaintiff alleged that defendant's misappropriation would result in lost contracts with a "finite-albeit large-number of

19

customers"). In sum, RediBag has not borne its burden of demonstrating that it requires preliminary injunctive relief to protect it from imminent, irreparable harm.

### b. Likelihood of Success

Plaintiff has also failed to establish likelihood of success.  Plaintiff insists that the two-year non-compete period in the Agreement began when the parties severed their relationship in March 2021.  Defendants, however, insist that this two-year period began to run in February 2019 and, thus, expired in February 2021 prior to Plaintiff's institution of this action.  Defendants assert that: (1) there was a break in the parties' relationship when Maierhoffer submitted his resignation letter in February 2019; and (2) under the Agreement, this break triggered the Agreement's two-year post-termination non-compete period, which Defendants maintain expired in February 2021. According to Plaintiff, although the parties' relationship changed in February 2019 after Maierhoffer's resignation letter, there was no break in the parties "independent contractor relationship."  Plaintiff also contends that—even if there was a clear break in the relationship in early 2019— under the terms of the Agreement, a two-year post-termination non-compete period would still run from March 2021 to March 2023 because, after Maierhoffer's February 2019 resignation, Plaintiff and Maierhoffer subsequently resumed their independent contractor relationship later that year.

Plaintiff has failed to establish that a likelihood of success on its breach of covenant claim.

First, the evidence indicates that there was a break in the parties' independent contractor relationship after Maierhoffer's February 8, 2019 resignation.

On February 8, 2019, Maierhoffer tendered a resignation letter to RediBag, which stated that the letter served as "formal notice of the termination" of Maierhoffer's "current 'employment agreement with [RediBag].'"  (Maierhoffer Aff., Ex. C.)  In the letter, Maierhoffer indicated that

20

he "will be happy to continue representing [RediBag] as an 'independent broker' with a 4% commission rate to be paid monthly <u>at mutually agreed upon accounts</u>."  (<u>Id.</u> (emphasis added).)

  In response to that letter, RediBag sent Maierhoffer a letter acknowledging his resignation, and indicating that RediBag "valued our <u>past</u> relationship with you and any <u>potential future relationship we may have</u>."  (Rabiea Decl., Ex. 2 (emphasis added).)  RediBag requested that Maierhoffer provide certain "necessary transition information," including information on "pending matters."  (<u>Id.</u>)  RediBag indicated that, after it received this information, it would "begin the process of account analysis to determine, which, <u>if any</u>, accounts we wish Mustang Marketing to handle for us and the price we are willing to pay for <u>such an agreement</u>."  (<u>Id.</u> (emphasis added).) RediBag's letter also attached a copy of the August 2016 Agreement and indicated that "[f]or the two year period following your voluntary termination, you are prohibited," by the Agreement, from using company information or soliciting customers.  (<u>Id.</u>)

  That same day, an email exchange between Maierhoffer and a RediBag employee occurred between 11:03 AM and 1:25 PM.[2]  In one email, Maierhoffer wrote:

> Now I'm not obligated to BS company projects; I can focus on relationship building again.  If you want to be part of that moving forward great, if NOT, I will move on.

> I'm confident this decision is the best and only decision for me as well as Redi-Bag.  At the end of the day, the only thing that has changed is that I'm responsible for my own expenses, I get paid a commission, I don't manage Rich/Darrell and I continue to promote Redi-Bag.

(Maierhoffer Decl. Ex. 3.)

  Rabiea's declaration asserts, in conclusory fashion, that, "Maierhoffer continued to serve as sales broker for RediBag after February 8." (Rabiea Decl. ¶ 17.)  However, Rabiea's declaration does not provide any details about how and when the relationship continued.  And, the email

---

[2]  The timing of these emails in relationship to the parties' February 8, 2019 letters is not identified in the record.

exchange above does not clearly establish that an independent contractor relationship between the parties continued, uninterrupted, after February 8, 2019.  By contrast, Maierhoffer's affidavit states that "it took months before Mustang and RediBag reached an understanding as to particular Mustang clients RediBag wanted to hire Mustang to represent."  (Maierhoffer Decl. ¶ 36.) Maierhoffer also explains that, after his resignation in February 2019, he did not broker another sale for RediBag until December 2019.[3]  (Id. ¶ 40.)

Contrary to Plaintiff's argument, the Court finds, based on the record above, that the parties' independent relationship terminated in February 2019 and then resumed sometime later in 2019 when Maierhoffer began to act again as an "independent broker" for RediBag—as he had done previously between 2008 and February 2016.  The Court now turns to the impact of this termination and break in the relationship under the August 2016 Agreement.

The remaining question is whether, given these facts and the termination in February 2019, the Agreement's two-year period of post-termination restraints began in February 2019 and ended in February 2021 or, as Plaintiff contends, a two-year period of post-termination restraints runs from March 2021 to March 2023.

Defendants insist that once the relationship was terminated, the two year non-compete period began to run.  Defendants contend that, under the Agreement, if the parties then re-establish an independent contractor relationship at some point in the future, the two-year non-compete does not reset.

By contrast, Plaintiff asserts that:

Had there been a temporary break in the relationship, the rules that governed that relationship would have resumed when the relationship resumed. There is nothing

---

[3]  According to Defendants' opposition brief, "RediBag refused to make any business-related commitments with Mustang until June 2019." (Defs.' Opp'n at 6.)  RediBag's reply brief cites this factual allegation and does not dispute it.  (Pl.'s Reply Br. at 5.)  It is also notable that, according to a March 10, 2021 letter from Maierhoffer's attorney, RediBag asked Maierhoffer to sign another non-compete agreement in December 2020.  (Rabiea Decl., Ex. 5.)

unusual about such an arrangement, and the fact that [the Agreement] could be modified only by a mutually executed writing shows that renegotiations of compensation arrangements and the like, or temporary suspensions of work, were not supposed to vitiate the agreement.

(Pl.'s Reply Br. at 4.)  Under Plaintiff's reading of the Agreement, if the parties terminate their relationship and then subsequently re-enter the relationship at later point in time, they are back at square one and, after a second termination, Plaintiff is then entitled to a new two-period beginning from the date of the second termination.

As an initial matter, Plaintiff's contention that that the events of February 2019 are analogous to "a temporary suspension of work or a mere renegotiation of compensation" are not persuasive.  The record before the Court shows that, in February 2019, the relationship terminated and that there was a break in the relationship before the parties re-established their relationship later that year.

Most importantly, the Court finds that the August 2016 Agreement is, at the very least, ambiguous as to how it applies when the parties' independent contractor relationship is terminated and then subsequently begins again at a later point in time.  As explained below, because restrictive covenants are construed narrowly under both Delaware and New York law, the narrower construction of these ambiguous provisions of the Agreement controls.  Accordingly, the two-period of post-termination restrains likely expired in February 2021.

The Agreement states, in relevant part:

1.  **Term of Agreement.** This Agreement is effective on the Effective Date, and shall remain in effect throughout the term of your relationship with the Company as an independent contractor and for a period of two years thereafter.

****

5. **Soliciting Customers after Termination of Agreement.**

****

B.  <u>If You voluntarily terminate your relationship with the Company as an</u> <u>independent contractor:</u> for a period of two (2) years following <u>the</u> <u>termination</u> of your relationship with the Company as an independent contractor, You shall not, directly or indirectly, disclose to any person, firm or corporation the names or addresses of any of the customers or clients of the Company or any other information pertaining to them. Neither shall you call on, solicit, take away, or attempt to call on, solicit, or take away any customer of the Company on whom You have called or with whom You became acquainted during the term of your relationship with the Company as an independent contractor, as the direct or indirect result of your relationship with the Company. There shall be one exception. You may continue to solicit Company customers with whom you personally have called on within the last twelve ( 12) months prior to termination, but only to sell product lines that are not competitive with the Company's existing business.

\*\*\*\*

**8. Modifications.**  This Agreement may be modified only be a writing executed by both you and the company.

(August 2016 Agreement (emphasis added).).

The Agreement refers to "<u>the</u> term of your relationship . . . as an independent contractor," which suggests a singular "term." (<u>Id</u>.)  Additionally, the Agreement has an "Effective Date" on which it became effective and provides that the Agreement "shall <u>remain</u> in effect throughout <u>the</u> <u>term</u> of [Defendants'] relationship as an independent contractor and for a period of two years thereafter." (<u>Id</u>.)  The Agreement's language indicating that it will "<u>remain</u> in effect . . . throughout <u>the term</u> of [the independent contractor] relationship" suggests that the "term of [Defendants'] relationship as an independent contractor" at issue is a single continuous time period during which the Agreement "remains" in effect.  (<u>Id</u>.)  Additionally, this provision of the Agreement references "a" single period of two years that continues after the "<u>the</u> term" of the relationship ends. Relatedly, the non-compete/non-solicitation provisions of the Agreement indicate that this two-year period—during which certain limitations apply—runs from "<u>the</u> termination of [Defendants']

relationship with the Company as an independent contractor."[4] (Id.) That language can be read to mean that the "the termination of [the] relationship," which triggers this two-year period—is a singular and one-time event.  (Id.)

As explained above, the Agreement is ambiguous on the question of whether, after a termination of the relationship, the parties' subsequent re-establishment of an independent contractor relationship and termination of that second independent contractor relationship results in a two-year period of post-termination restrictions that runs from the date of the second termination.   Given this ambiguity, the Court adopts the narrow construction that favors Defendants because under both Delaware and New York law, restrictive covenants are construed narrowly.[5]  See Smartmatic Int'l Corp. v. Dominion Voting Sys. Int'l Corp., No. CIV.A. 7844-VCP, 2013 WL 1821608, at *9 (Del. Ch. May 1, 2013) ("Delaware courts construe restrictive covenants narrowly as written."); Cortez, Inc. v. Doheny Enterprises, Inc., No. 17 C 2187, 2017 WL 2958071, at *7 (N.D. Ill. July 11, 2017) ("[Plaintiff's] broad interpretation of the non-solicitation clause . . . contradicts Delaware law which instructs courts to construe restrictive covenants narrowly"); Elite Promotional Mktg., Inc. v. Stumacher, 8 A.D.3d 525, 526, 779 N.Y.S.2d 528, 530 (N.Y. App. Div. 2d Dep't 2004) ("A covenant against competition must be construed strictly.").[6]

---

[4]  The heading of paragraph 5 in the Agreement also appears to equate the "termination" of the "relationship" with the "termination of the Agreement."  (See Agreement ¶ 5 ("Soliciting Customers after Termination of Agreement.").)

[5]  Even without resorting to this rule of construction that specifically applies to restrictive covenants, the ambiguity in the Agreement would likely also permit the Court, under both Delaware and New York law, to consider extrinsic evidence in interpreting the ambiguous Agreement.  Relevant extrinsic evidence here could include:  (1) the parties' course of dealing; (2) Defendants' prior "independent broker" relationship with the Company; and (3) the absence of contractual restraints during the period between 2008 and [  ] 2016 during the "independent broker" relationship.

[6] Plaintiff maintains that Delaware law governs due to the choice of law provision in August 2016 Agreement.  Since the result is the same under both Delaware law and New York law, it is unnecessary to address Plaintiff's argument that Delaware law should govern the interpretation and enforcement of the Agreement.

Because Plaintiff has not established that it is likely to succeed in establishing that the two-year restrictive period began again in March 2021, Plaintiff cannot establish a likelihood of success on its breach of covenant claim.[7]

### III.  CONCLUSION

Based on the foregoing, Plaintiff's application for a preliminary injunction is DENIED, and Defendants' motion to dismiss for failure to state a claim and for improper venue is DENIED.

**SO ORDERED.**

Dated:  March 1, 2022
       Central Islip, New York

                                                        /s/ (JMA)
                                            JOAN M. AZRACK
                                            UNITED STATES DISTRICT JUDGE

---

[7] Under the circumstances, the Court does not have to reach the question of whether, if RediBag's interpretation of the Agreement were correct, a two-year restraint period running from March 2021 to March 2023 would be reasonable and, thus, enforceable.  This would appear to be a fact-intensive inquiry.  After Maierhoffer's February 2019 resignation, he apparently returned to his original status as an independent broker and only engaged in a limited number of transactions for RediBag.  The nature of Maierhoffer's renewed relationship with RediBag after the February 2019 resignation appears to have been significantly different than Maierhoffer's relationship with RediBag between [  ] 2016 and February 2019.  Accordingly, even assuming _arguendo_ that enforcement of a two-year post-termination restraint period from February 2019 to February 2021 would be reasonable, it is not clear that application of a two-year post-termination restrain period running from March 2021 to March 2023 would also be reasonable.